**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Allen STANDRIDGE,**
**Defendant-Appellant.**

**No. 86-8455**
**Non-Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 19, 1987.

---

Stephanie Kearns, Federal Defender Program, Inc., Atlanta, Ga., for defendant-appellant.

Stephen S. Cowen, U.S. Atty., Richard B. Kuniansky, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before FAY, ANDERSON and EDMONDSON, Circuit Judges.

PER CURIAM:

Appellant James Standridge was convicted of four crimes: (1) bank robbery, 18 U.S.C. sec. 2113(a); (2) assaulting a person or placing a person's life in jeopardy by use of a dangerous weapon while robbing a bank, 18 U.S.C. sec. 2113(d); (3) using a dangerous weapon while committing a federal crime of violence, 18 U.S.C. sec. 924(c); and (4) possession of a firearm by a felon with three prior convictions for robbery or burglary, 18 U.S.C.App. sec. 1202(a). We affirm.

On February 25, 1986, at 10:45 a.m., a lone white male attempted to rob a bank in Atlanta, Georgia. Witnesses described the would-be robber to the FBI as approximately thirty years old, with a mustache and stubbly beard. At 11:41 a.m. the same

morning, a white male of the same description robbed a bank in nearby Doraville, Georgia. He displayed a pistol and obtained $4,485.00. The teller at the second bank noticed that the robber was wearing a light blue jacket. In both incidents, the robber escaped in a blue, foreign-made car.

A bank surveillance camera had been activated during the robbery attempt at the first bank. By 2:39 p.m., the FBI had developed the film, which depicted an almost "portrait-quality" photograph of the would-be robber. The FBI released the photo, with a short news release, to television stations in the Atlanta area.

At about 7:00 p.m., appellant's brother called the FBI, notifying them that the robber was appellant and that appellant had probably gone to a Ramada Inn in Marietta, Georgia. FBI agents were dispatched both to the brother's apartment and to the Ramada Inn.

Around 7:30 p.m., the FBI interviewed both Stanley Standridge, appellant's brother, and the brother's girlfriend, Kim Bender. Both Stanley and Kim identified appellant as the would-be robber in the bank surveillance photo. Kim also identified the sunglasses that appellant was wearing in the bank photo as a pair of sunglasses which she had given to appellant earlier in the day.

Kim told the FBI that appellant had borrowed her light blue Toyota Corolla early that morning and called her shortly after noon to tell her that it had broken down. Kim drove Stanley's pickup over to where appellant was waiting with her stalled Toyota and tried to jump start the Toyota. When she reached under the front seat of the Toyota for a tool, she noticed a stack of neat, crisp and paper-clipped five dollar bills. She also saw appellant remove a bank bag from the trunk of her Toyota and put it in the pickup.

Stanley told the FBI that when appellant and Kim returned to the apartment about 1:00 p.m., appellant had in his possession several stacks of cash. Stanley observed appellant count out approximately $3,000.00 in cash and later that afternoon

saw appellant carrying a cloth bag. When Stanley asked appellant what was inside, appellant opened the bag, and Stanley observed a quantity of cash. Stanley told the FBI that appellant had taken a taxi to the Ramada Inn about 5:30 p.m.

The FBI agents completed the interview with Kim and Stanley about 7:45 p.m. They then drove to the Ramada Inn where other FBI agents had already learned that appellant had checked into a sixth floor room on a "pay-as-you-go" basis and that room service had delivered dinner to appellant at approximately 7:00 p.m.

The FBI agents phoned an Assistant United States Attorney, who verbally authorized them to proceed with a warrantless arrest. Thereupon, at about 8:30 p.m. an FBI agent dressed as a porter knocked on the door of appellant's motel room, as though he had come to clear the dinner dishes. When appellant Standridge opened the door, a group of FBI agents burst into the room. They arrested Standridge, and seized evidence including a drawstring bag, a loaded pistol, $3,219.00 cash, a wallet, a pair of sunglasses, a light blue jacket, and a money wrapper.

I. The Motion to Suppress Evidence

On appeal, Standridge argues that the district court erred by not suppressing the evidence seized in the motel room because there were no exigent circumstances to justify the warrantless arrest. Standridge points out that more than seven hours had passed since the robberies and that Stanley and Kim had notified the FBI that he had helped them move furniture that afternoon.

 The fourth amendment prohibits the police from making a warrantless and non-consensual entry into a suspect's home for purposes of making a felony arrest, unless exigent circumstances are present. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). This fourth amendment requirement applies to a motel room. *See, e.g., United States v. Bulman*, 667 F.2d 1374 (11th Cir.1982), *cert. denied sub nom., Howard v. United*

*States,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982).

■ Exigent circumstances do not necessarily involve "hot pursuit" of a fleeing criminal. Factors which indicate exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public. *See Dorman v. United States,* 435 F.2d 385, 392–93 (D.C.Cir.1970) (en banc); *United States v. Campbell,* 581 F.2d 22, 25–27 (2d Cir.1978); *United States v. Newbern,* 731 F.2d 744, 748–49 (11th Cir.1984); *United States v. Roper,* 681 F.2d 1354, 1357 n. 1 (11th Cir.1982) (dictum), *cert. denied sub nom. Newton v. United States,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983).

■ In the present case, the circumstances were sufficiently exigent to justify a warrantless arrest. The FBI had probable cause to believe that Standridge had attempted to rob one bank and actually robbed another earlier that day. There was reason to believe Standridge was armed. At any moment, Standridge's brother could have felt remorse and called Standridge to warn him, or Standridge could have seen his own photo on a television news report about the robberies. If the FBI delayed, Standridge might dispose of the stolen cash or other evidence. More importantly, any delay increased the risk that innocent members of the public might be injured if Standridge attempted to leave the motel. It was safer to arrest Standridge immediately by surprise in his motel room, than to wait for a warrant, and to risk a gun battle erupting in the halls, stairs, lobby or other public area of the fully occupied hotel should Standridge try to escape.

■ Standridge argues that even if the warrantless arrest was justified by exigent circumstances, the ensuing warrantless search of his motel room was impermissible. A search incident to arrest is always allowed of the suspect's person and the immediate area from which the suspect can grab a weapon or destroy evidence, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Broader searches may be permissible depending upon the circumstances.

■ Every arrest must be presumed to present a risk of danger to the arresting officer. *Washington v. Chrisman,* 455 U.S. 1, 8, 102 S.Ct. 812, 817, 70 L.Ed.2d 778 (1982). Where necessary, police arresting a suspect may conduct a protective sweep of the area to check for other persons who might pose a threat to the safety of the officers or the public. *See United States v. Diecidue,* 603 F.2d 535, 559 (5th Cir. 1979); *cert. denied sub nom., Antone v. United States,* 445 U.S. 946, 100 S.Ct. 1435, 63 L.Ed.2d 781 (1980); *United States v. Bowdach,* 561 F.2d 1160, 1169 (5th Cir. 1977).[1]

■ Such a security sweep is particularly reasonable where, as was the situation in the case sub judice, officers are arresting a suspect they believe to be armed and dangerous, who might not be alone[2] and who in fact physically resists the arrest. In such a volatile arrest scenario, officers may reasonably conduct a protective sweep of a motel room and adjoining bathroom, so long as there is uncertainty as to whether there might be others present. *See United States v. Sheikh,* 654 F.2d 1057, 1071 (5th Cir. Unit A 1981) (protective sweep of motel room where "officers did not know

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

**2.** The police had not followed Standridge when he went to the motel and the room had not been constantly watched; thus, the police could not know whether Standridge was alone.

whether [the suspect] was going to meet someone inside the ... room."), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). The police officers' need to ensure their own safety is compelling. If the officers' spot evidence during a protective sweep, they may seize it. *See, e.g., United States v. Hultgren*, 713 F.2d 79, 88–89 (5th Cir.1983).

When Standridge opened the door, approximately eight FBI agents burst into the room. The first few agents grabbed Standridge, holding him against a wall, then forcing him down on the first bed as Standridge struggled in resistance. Other agents rushed past into the room. Within seconds after entry, Agent Graham asked another agent to cover him, and both agents looked under the second bed. Agent Graham's vision was blocked by clothing and a bag. As he pushed aside the clothing and bag to see if anybody was behind them under the bed, he felt a heavy object like a gun in the bag. He opened the drawstring bag, and saw inside a pistol and a large quantity of cash. The FBI seized the bag, pistol, money, and clothing.

As part of the protective sweep, another agent looked in the bathroom, where he observed a money wrapper floating in the water of the toilet bowl. The lid of the toilet was raised. The FBI agent seized the money wrapper. In addition, FBI agents seized Standridge's wallet, sunglasses and light blue jacket which were in plain view.

These items of evidence were spotted either in plain view or during a protective sweep immediately incident to the arrest of a person believed to be armed and to have recently committed a serious and violent crime. Because the agents were acting for their own safety when the items were found, the FBI properly seized the items without a warrant; and the district judge properly denied the motion to suppress.

## II. The Firearm Possession Conviction

### A. Predicate Offenses

Standridge was convicted under 18 U.S. C.App. sec. 1202(a) for possessing a firearm while having three prior convictions for burglary or robbery. Section 1202(a) provides that:

> Any person who ... has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony ... and who receives, possesses, or transports in commerce or affecting commerce ... any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both. *In the case of a person who* receives, *possesses*, or transports in commerce or affecting commerce *any firearm and who has three previous convictions ... for robbery or burglary*, or both, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years ... (emphasis added.)

Standridge argues that the government failed to prove three *valid* prior convictions. Although the government introduced into evidence certified copies of four previous burglary convictions, Standridge contends that the government failed to prove that two of these were valid. The certified copy of Standridge's 1974 conviction for burglary did not show on its face that Standridge had counsel or waived his right to counsel. Also, the government did not prove that the Superior Court of Clarke County, Georgia, in which Standridge was convicted for burglary in 1970 when he was allegedly fifteen, had jurisdiction to try him as an adult.

In light of *Lewis v. United States*, 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), it is unnecessary that the three predicate convictions be truly valid in order to satisfy section 1202(a).[3] Firearms of-

---

3. Congress amended section 1202(a) in 1984 by adding the provision under which Standridge was convicted. Comprehensive Crime Control Act of 1984, P.L. 98–473, Title II, secs. 1802, 1803, 98 Stat. 1837, 2185 (Oct. 12, 1984). Four years earlier, in *Lewis*, the Supreme Court held that there is no statutory requirement that the government prove, in a prosecution for firearms possession under section 1202(a), the validity of a predicate felony conviction. We presume that Congress was aware of the *Lewis* decision, and that it deliberately chose not to require valid

fenses, such as we have here, involve special considerations as *Lewis* evidences. Consequently, there may also be no constitutional difficulty with using a prior conviction to establish a predicate offense in a prosecution for possession of a firearm by a repeat offender even though the prior conviction might—in some ultimate sense—be invalid if it were the subject of a collateral attack. We find it unnecessary to reach this constitutional issue, however.

■ The validity of two of the convictions introduced against Standridge is unquestioned. The validity of a 1970 conviction has been questioned, but Standridge failed to show its invalidity. Even if Standridge can, in the present case, collaterally attack this 1970 conviction on the grounds that the Georgia Superior Court lacked jurisdiction to try him as an adult, Standridge bears the burden of showing lack of jurisdiction. We disagree with Standridge's novel suggestion that the due process clause requires the government, when establishing predicate offenses in a firearms prosecution, to bear the burden of proving that prior convictions were rendered by courts with jurisdiction.[4]

■ Standridge failed to meet his burden when challenging his 1970 conviction. At trial, Standridge simply testified that he was fifteen in 1970 when the Superior Court of Clarke County convicted him of burglary. But it appears that under Georgia law and constitutional provisions in effect in 1970, Superior Courts had *exclusive jurisdiction* to try juveniles aged 15 years or older for felony offenses, and that no transfer from a juvenile court was neces-

sary before a Superior Court exercised its exclusive jurisdiction to try and convict such a juvenile. *See Holmes v. State,* 224 Ga. 553, 163 S.E.2d 803, 807 (1968); Georgia Constitution of 1945, Art. VI, Sec. IV, Par. 1, *proposed,* 1945 Ga.Laws 45, *codified,* Ga.Code Ann., Sec. 2–3901, *amendment proposed,* 1972 Ga.Laws 1544; Juvenile Act of 1951, 1951 Ga.Laws 291, 292, *amended,* 1955 Ga.Laws 581, 582, *codified* Ga.Code Ann. sec. 24–2410 (1971 ed.), *repealed,* 1971 Ga.Laws 709, 756; *cf. Mathis v. State,* 231 Ga. 401, 202 S.E.2d 73, 75 (1973) (discussing subsequent 1972 amendment of Georgia constitution). Thus, the 1970 conviction is not invalid on its face nor does it hint at invalidity. Certainly, Standridge presented no evidence that the Superior Court was not properly exercising jurisdiction over a fifteen year old.

Because the trial court had evidence of, at least, three truly valid convictions, both the statute and the Constitution are satisfied.

**B. Nexus With Interstate Commerce**

■ Section 1202(a) requires that the felon must possess a firearm "in commerce or affecting commerce." Standridge argues that the government failed to prove a nexus between the gun he possessed and interstate commerce.

The Supreme Court has held, however, that the interstate nexus requirement of the section 1202(a) possession offense is satisfied by proof that the firearm had previously traveled in interstate commerce. *Scarborough v. United States,* 431 U.S.

---

prior convictions in a prosecution for firearm possession by a three-time felon as well. Certainly, had Congress wished that only valid convictions be used, Congress could have said so. *See Florida Nat. Guard v. Federal Labor Rel. Authority,* 699 F.2d 1082, 1087 (11th Cir.) ("Congress is deemed to know the executive and judicial gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning."), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

**4.** In cases not involving firearm possession offenses, we have held in the past that the govern-

ment has the burden of proving the validity of a prior conviction where the record is silent as to whether an indigent defendant had counsel. *See, e.g., Mitchell v. United States,* 482 F.2d 289, 294–95 (5th Cir.1973). But *Mitchell* and other such cases involve the unique problem that indigent defendants were, until the early 1960's, routinely denied their constitutional right to assistance of counsel. Assuming (but not deciding) that *Mitchell* has application in a section 1202(a) firearms case, we see no reason to extend *Mitchell* to require the government to prove that a prior conviction was rendered by a court with jurisdiction.

563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). The government here presented evidence that the gun had been manufactured in Massachusetts, and that appellant possessed the gun in Georgia. This evidence is sufficient to establish that the gun had traveled in interstate commerce. *See United States v. Perkins,* 633 F.2d 856, 859 (8th Cir.1981).

Accordingly, the judgment of the district court is AFFIRMED.